**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| RYAN TENNANT and MAISIE TENNANT, individually and as parents and next friends of R.T., a minor,<br><br>Plaintiffs,<br><br>vs.<br><br>SIERRA NEVADA CHEESE COMPANY, INC., a California corporation,<br><br>Defendant. | Case No.:<br><br>**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |

NOW COME Plaintiffs RYAN TENNANT and MAISIE TENNANT (hereinafter collectively "Plaintiffs"), individually and as parents and next friends of their minor child, R.T., by and through their attorneys of record, and for their causes of action against Defendant Sierra Nevada Cheese Company, Inc., complain, allege, and state as follows:

## I. PARTIES

1. Plaintiffs Ryan Tennant and Maisie Tennant are the father and mother, and natural guardians, of R.T., a minor. They bring this action individually, on their own behalf, and on R.T.'s behalf as R.T.'s next friends pursuant to Federal Rule of Civil Procedure 17(c).



MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890

Consistent with Federal Rule of Civil Procedure 5.2(a)(3), R.T. is identified in this Complaint by initials only.

2. Plaintiffs and R.T. are now, and were at all times material to this Complaint, residents of Charlotte, Eaton County, Michigan, where they reside together, and are therefore citizens of the State of Michigan.

3. Defendant Sierra Nevada Cheese Company, Inc. (hereinafter "Sierra Nevada" or "Defendant") is, and was at all times material to this Complaint, a corporation organized and existing under the laws of the State of California, with its principal place of business located at 6530 County Road 39, Willows, California. Sierra Nevada is therefore a citizen of the State of California. At all times material to this Complaint, Sierra Nevada manufactured, distributed, and sold the adulterated food product at issue in this matter—Graziers raw milk cheese—which it distributed nationwide through distributors, retailers, and direct customers, including, upon information and belief, through Azure Standard, the distributor from which Plaintiffs purchased, and to which Sierra Nevada supplied, the Graziers raw milk cheese that was delivered to Plaintiffs in Michigan and consumed by R.T.

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiffs and Defendant. Plaintiffs are each citizens of the State of Michigan. Defendant is a citizen of the State of California, where it is incorporated and maintains its principal place of business. Defendant is not a citizen of the State of Michigan.



MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890

5. This Court has personal jurisdiction over Defendant because Defendant transacted business within the State of Michigan, including by distributing and selling its Graziers raw milk cheese products for sale and delivery to consumers in this State, and because Defendant's acts and omissions caused consequences in this State that give rise to this action, namely the delivery of Defendant's contaminated product to Plaintiffs in Michigan, R.T.'s consumption of that product in Eaton County, Michigan, and R.T.'s resulting illness. Plaintiffs' claims arise out of and relate to Defendant's contacts with the State of Michigan, such that the maintenance of this suit in this Court is fair, reasonable, and just.

6. Venue is proper in the United States District Court for the Western District of Michigan, Southern Division, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

## III. GENERAL ALLEGATIONS

### A. The 2026 Multistate Outbreak of *E. coli O26:H11* Linked to Graziers Raw Milk Cheese.

7. On September 25, 2026, the Centers for Disease Control and Prevention ("CDC") announced that it, the U.S. Food and Drug Administration ("FDA"), and public health officials in several states were investigating a multistate outbreak of *E. coli* infections linked to Graziers raw milk cheeses sold by Sierra Nevada. According to the CDC, the investigation concerns a multistate outbreak of *E. coli O26:H11* infections, and epidemiologic data show that Sierra Nevada Graziers raw milk cheese may be contaminated with *E. coli* and making people sick.

8. As of September 25, 2026, thirteen people infected with the outbreak strain of *E. coli* had been reported from nine states, according to the CDC:



MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890




9. Illnesses started on dates ranging from July 7, 2026, to August 26, 2026. Of the thirteen people with information available, eight (62%) were hospitalized, and three developed hemolytic uremic syndrome ("HUS"). No deaths have been reported. Sick people ranged in age from one to fifty-eight years, with a median age of five, and over half of the sick people in this outbreak are children 5 years old and younger.

10. According to the CDC, the true number of sick people in this outbreak is likely much higher than the number reported, and the outbreak may not be limited to the states with known illnesses. This is because many people recover without medical care and are not tested for *E. coli*. In addition, recent illnesses may not yet be reported, as it usually takes three to four weeks to determine whether a sick person is part of an outbreak.

11. State and local public health officials interviewed sick people about the foods they ate in the week before they got sick. Of the nine people interviewed, nine (100%) reported eating Sierra Nevada's Graziers raw milk cheese. According to the CDC, this percentage is



MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890

significantly higher than the 4.9% of respondents who reported eating unpasteurized (raw) milk cheese in the FoodNet Population Survey, and this difference suggests that people in this outbreak got sick from eating raw milk cheese.

12. Public health investigators used the PulseNet system to identify illnesses that may be part of this outbreak. CDC PulseNet manages a national database of DNA fingerprints of bacteria that cause foodborne illnesses, and DNA fingerprinting is performed on bacteria using a method called whole genome sequencing ("WGS"). WGS showed that bacteria from sick people's samples are closely related genetically, which suggests that people in this outbreak got sick from the same food.

13. The CDC has warned consumers not to eat the recalled Graziers raw milk cheeses produced by Sierra Nevada, noting that these products have a long shelf life, and has advised consumers to check their homes, refrigerators, and freezers for the recalled cheese and to throw it out or return it. The CDC has further advised consumers to choose pasteurized milk and dairy products, noting that this is especially important for children under 5 because they are more likely to get a severe foodborne illness.

**B. Sierra Nevada's Recall of All Graziers Raw Milk Cheese.**

14. On September 28, 2026, Sierra Nevada announced that it was voluntarily recalling all Graziers Raw Milk Cheese currently in the market due to potential contamination with *E. coli O26:H11*. The FDA published Sierra Nevada's recall announcement on September 29, 2026. The products identified in the announcement are Sierra Nevada Graziers brand Monterey Jack, Jalapeno Jack, Medium Cheddar, and Sharp Cheddar raw milk cheeses.

15. In its recall announcement, Sierra Nevada acknowledged that *E. coli O26:H11* is a Shiga toxin-producing type of *E. coli* ("STEC") that can cause serious and sometimes fatal



MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890

infections in young children, elderly people, and others with weakened immune systems; that *E. coli O26:H11* can cause acute diarrheal illness, often with bloody stools, within a few days of ingestion of the bacteria; and that a subset of infected individuals—especially children under 5 years of age, the elderly, and immunocompromised individuals—may develop HUS, a severe illness characterized by hemolytic anemia (red cell breakdown), thrombocytopenia (low platelet count), and renal failure that can lead to death.

16. Sierra Nevada further stated that the investigation had not been narrowed to a specific lot, date code, or production date, and that it was therefore recalling all of the Graziers Raw Milk Cheese products in distribution. According to Sierra Nevada, the recalled products were distributed nationwide through distributors, retailers, and direct customers.

17. Sierra Nevada initiated the recall only after being contacted by the FDA regarding the ongoing FDA/CDC outbreak investigation. Thereafter, Sierra Nevada stopped production and shipment of all Graziers Raw Milk Cheese, notified customers that had purchased the affected products directly from it, and issued notices through its website and social media.

**C. The *E. coli* Bacteria.**

18. *E. coli* is an archetypal commensal bacterial species that lives in mammalian intestines. *E. coli O26:H11*, like *O157:H7*, is one of thousands of types of *Escherichia coli*.[1]

[1] *E. coli* bacteria were discovered in the human colon in 1885 by German bacteriologist Theodor Escherich. Feng, Peter, Stephen D. Weagant, Michael A. Grant, Enumeration of *Escherichia coli* and the Coliform Bacteria, in BACTERIOLOGICAL ANALYTICAL MANUAL (8th Ed. 2002), http://www.cfsan.fda.gov/~ebam/bam-4.html. Dr. Escherich also showed that certain strains of the bacteria were responsible for infant diarrhea and gastroenteritis, an important public health discovery. *Id.* Although the bacteria were initially called Bacterium coli, the name was later changed to *Escherichia coli* to honor its discoverer. *Id.*



MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890

The combination of letters and numbers in the name of the *E. coli O26:H11* refers to the specific antigens (proteins which provoke an antibody response) found on the body and tail or flagellum[2] respectively and distinguish it from other types of *E. coli.*[3] Most types of *E. coli* are harmless and live as normal flora in the intestines of healthy humans and animals.[4] The *E. coli* bacterium is among the most extensively studied microorganisms.[5] The testing done to distinguish *E. coli O26:H11* from its other *E. coli* counterparts is called serotyping.[6]

19. *E. coli O26:H11's* ability to induce injury in humans is a result of its ability to produce numerous virulence factors, most notably Shiga-like toxins.[7] Shiga toxin ("Stx") has multiple variants (*e.g.*, Stx1, Stx2, Stx2c), and acts like the plant toxin ricin by inhibiting protein synthesis in endothelial and other cells.[8] Shiga toxin is one of the most potent toxins

---

[2] Not all *E. coli* are motile. For example, *E. coli O157:H7* which lack flagella are thus *E. coli O157:NM* for non-motile.

[3] CDC, *Escherichia coli O157:H7*, General Information, Frequently Asked Questions: What is *Escherichia coli O157:H7*?, http://www.cdc.gov/ncidod/dbmd/diseaseinfo/escherichiacoli_g.htm.

[4] Marion Nestle, Safe Food: Bacteria, Biotechnology, and Bioterrorism, 40-41 (1st Pub. Ed. 2004).

[5] James M. Jay, MODERN FOOD MICROBIOLOGY at 21 (6th ed. 2000). ("This is clearly the most widely studied genus of all bacteria.")

[6] Beth B. Bell, MD, MPH, *et al.* A Multistate Outbreak of *Escherichia coli O157:H7*-Associated Bloody Diarrhea and Hemolytic Uremic Syndrome from Hamburgers: The Washington Experience, 272 JAMA (No. 17) 1349, 1350 (Nov. 2, 1994) (describing the multiple step testing process used to confirm, during a 1993 outbreak, that the implicated bacteria were *E. coli O157:H7*).

[7] Griffin & Tauxe, *supra* note 12, at 61-62 (noting that the nomenclature came about because of the resemblance to toxins produced by Shigella dysenteries).

[8] Sanding K, Pathways followed by ricin and Shiga toxin into cells, Histochemistry and Cell Biology, vol. 117, no. 2:131-141 (2002). Endothelial cells line the interior surface of blood vessels. They are known to be extremely sensitive to *E. coli O157:H7*, which is cytotoxigenic to these cells making them a primary target during STEC infections.



MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890

known.[9]

20. STEC like *E. coli* O26:H11 infections can lead to HUS, a severe, life-threatening complication.[10] HUS accounts for the majority of the acute deaths and chronic injuries caused by the bacteria.[11] HUS occurs in 2-7% of victims, primarily children, with onset five to ten days after diarrhea begins.[12] It is the most common cause of renal failure in children.[13] Approximately half of the children who suffer HUS require dialysis, and at least 5% of those who survive have long-term renal impairment.[14] Five percent of those who survive may also suffer from severe brain damage.[15] While somewhat rare, serious injury to the pancreas,

---

[9] Johannes L, Shiga toxins—from cell biology to biomedical applications. Nat Rev Microbiol 8, 105-116 (February 2010). Suh JK, et al. Shiga Toxin Attacks Bacterial Ribosomes as Effectively as Eucaryotic Ribosomes, Biochemistry, 37 (26); 9394–9398 (1998).

[10] Griffin & Tauxe, *supra* note 12, at 65-68. *See also* Josefa M. Rangel, *et al*. *Epidemiology of* Escherichia coli *O157:H7 Outbreaks, United States, 1982-2002*, 11 Emerging Infect. Dis. (No. 4) 603 (April 2005) (noting that HUS is characterized by the diagnostic triad of hemolytic anemia—destruction of red blood cells, thrombocytopenia—low platelet count, and renal injury—destruction of nephrons often leading to kidney failure).

[11] Richard L. Siegler, MD, *The Hemolytic Uremic Syndrome*, 42 Ped. Nephrology, 1505 (Dec. 1995) (noting that the diagnostic triad of hemolytic anemia, thrombocytopenia, and acute renal failure was first described in 1955). ("[HUS] is now recognized as the most frequent cause of acute renal failure in infants and young children.") *See also* Beth P. Bell, MD, MPH, *et al*. *Predictors of Hemolytic Uremic Syndrome in Children During a Large Outbreak of Escherichia coli O157:H7 Infections*, 100 Pediatrics 1, 1 (July 1, 1997), at http://www.pediatrics.org/cgi/content/full/100/1/e12.

[12] Tauxe, *supra* note 25, at 1152. *See also* Nasia Safdar, MD, *et al*. *Risk of Hemolytic Uremic Syndrome After Treatment of* Escherichia coli *O157:H7 Enteritis: A Meta-analysis*, 288 JAMA (No. 8) 996, 996 (Aug. 28, 2002). ("*E. coli* serotype *O157:H7* infection has been recognized as the most common cause of HUS in the United States, with 6% of patients developing HUS within 2 to 14 days of onset of diarrhea."). Amit X. Garg, MD, MA, *et al*. *Long-term Renal Prognosis of Diarrhea-Associated Hemolytic Uremic Syndrome: A Systematic Review, Meta-Analysis, and Meta-regression*, 290 JAMA (No. 10) 1360, 1360 (Sept. 10, 2003). ("Ninety percent of childhood cases of HUS are…due to Shiga-toxin producing *Escherichia coli*.")

[13] Su & Brandt, *supra* note 11.

[14] Safdar, supra note 12, at 996 (going on to conclude that administration of antibiotics to children with *E. coli O157:H7* appeared to put them at higher risk for developing HUS).

[15] Richard L. Siegler, MD, *Postdiarrheal Shiga Toxin-Mediated Hemolytic Uremic Syndrome*, 290 JAMA (No. 10) 1379, 1379 (Sept. 10, 2003).



MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890

resulting in the development of diabetes or even death, can also occur.[16] There is no cure or effective treatment for HUS.[17]

21. HUS is believed to develop when the toxin from the bacteria, known as Shiga-like toxin ("SLT"), enters the circulation through the inflamed bowel wall.[18] SLT, and most likely other chemical mediators, attach to receptors on the inside surface of blood vessel cells (endothelial cells) and initiate a chemical cascade that results in the formation of tiny thrombi (blood clots) within these vessels.[19] Some organs seem more susceptible, perhaps due to the presence of increased numbers of receptors, and include the kidney, pancreas, and brain.[20] By definition, when fully expressed, HUS presents with the triad of hemolytic anemia (destruction of red blood cells), thrombocytopenia (low platelet count), and renal failure (loss of kidney function).[21]

22. As already noted, there is no known therapy to halt the progression of HUS. HUS is a frightening complication that even in the best American hospitals has a notable mortality rate.[22] Among survivors, at least five percent will suffer end-stage renal disease

---

[16] Pierre Robitaille, *et al.*, *Pancreatic Injury in the Hemolytic Uremic Syndrome*, 11 Pediatric Nephrology 631, 632 (1997) ("although mild pancreas involvement in the acute phase of HUS can be frequent").

[17] Safdar, supra note 12, at 996. *See also* Siegler, supra note 15, at 1379. ("There are no treatments of proven value, and care during the acute phase of the illness, which is merely supportive, has not changed substantially during the past 30 years.")

[18] Garg, supra note 12, at 1360.

[19] *Id*. Siegler, supra note 11, at 1509-11 (describing what Dr. Siegler refers to as the "pathogenic cascade" that results in the progression from colitis to HUS).

[20] Garg, supra note 12, at 1360. *See also* Su & Brandt, *supra* note 11, at 700.

[21] Garg, supra note 12, at 1360. *See also* Su & Brandt, *supra* note 11, at 700.

[22] Siegler, supra note 11, at 1519 (noting that in a "20-year Utah-based population study, 5% dies, and an equal number of survivors were left with end-stage renal disease (ESRD) or chronic brain damage.")



MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890

("ESRD") with the resultant need for dialysis or transplantation.[23] But, "[b]ecause renal failure can progress slowly over decades, the eventual incidence of ESRD cannot yet be determined."[24] Other long-term problems include the risk for hypertension, proteinuria (abnormal amounts of protein in the urine that can portend a decline in renal function), and reduced kidney filtration rate.[25] Since the longest available follow-up studies of HUS victims are 25 years, an accurate lifetime prognosis is not really available and remains controversial.[26] All that can be said for certain is that HUS causes permanent injury, including loss of kidney function, and it requires a lifetime of close medical monitoring.

23. The term reactive arthritis refers to an inflammation of one or more joints, following an infection localized at another site distant from the affected joints. The predominant site of the infection is the gastrointestinal tract. Several bacteria, including *E. coli*, induce septic arthritis.[27] The resulting joint pain and inflammation can resolve completely over time or permanent joint damage can occur.[28]

24. Reactive arthritis may develop after a person eats food that has been tainted with bacteria. In a small number of persons, the joint inflammation is accompanied by conjunctivitis (inflammation of the eyes) and urethritis (painful urination). This triad of symptoms is called

---

[23] Garg, supra note 12, at 1366-67.
[24] Siegler, supra note 11, at 1519.
[25] *Id*. at 1519-20. *See also* Garg, supra note 12, at 1366-67.
[26] Garg, supra note 12, at 1368.
[27] *See* J. Lindsey, "Chronic Sequellae of Foodborne Disease," *Emerging Infectious Diseases*, Vol. 3, No. 4, Oct-Dec, 1997.
[28] *Id*.



MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890

Reiter syndrome.[29] Reiter syndrome, a form of reactive arthritis, is an uncommon but debilitating syndrome caused by gastrointestinal or genitourinary infections. The most common gastrointestinal bacteria involved are *Salmonella*, *Campylobacter*, *Yersinia*, and *Shigella*. Reiter syndrome is characterized by a triad of arthritis, conjunctivitis, and urethritis, although not all three symptoms occur in all affected individuals.[30]

25. Although the initial infection may not be recognized, reactive arthritis can still occur. Reactive arthritis typically involves inflammation of one joint (monoarthritis) or four or fewer joints (oligoarthritis), preferentially affecting those of the lower extremities; the pattern of joint involvement is usually asymmetric. Inflammation is common at entheses – *i.e.*, the places where ligaments and tendons attach to bone, especially the knee and the ankle.

26. A recently published study surveyed the extant scientific literature and noted that post-infectious irritable bowel syndrome ("PI-IBS"), a form of irritable bowel syndrome ("IBS"), is a common clinical phenomenon first described over five decades ago.[31] The Walkerton Health Study ("WHS") further notes that:

> Between 5% and 30% of patients who suffer an acute episode of infectious gastroenteritis develop chronic gastrointestinal symptoms

---

[29] *Id*. *See also* Dworkin, *et al*., "Reactive Arthritis and Reiter's Syndrome following an outbreak of gastroenteritis caused by Salmonella enteritidis," *Clin. Infect. Dis*., 2001 Oct. 1;33(7): 1010-14; Barth, W. and Segal, K., "Reactive Arthritis (Reiter's Syndrome)," *American Family Physician*, Aug. 1999, online at www.aafp.org/afp/990800ap/ 499.html.

[30] Hill Gaston JS, Lillicrap MS. (2003). Arthritis associated with enteric infection. *Best Practices & Research Clinical Rheumatology*. 17(2):219-39.

[31] J. Marshall, *et al., Incidence and Epidemiology of Irritable Bowel Syndrome After a Large Waterborne Outbreak of Bacterial Dysentery*, Gastro., 2006; 131; 445-50 (hereinafter "Walkerton Health Study" or "WHS"). The WHS followed one of the largest *E. coli O157:H7* outbreaks in the history of North America. Contaminated drinking water caused over 2,300 people to be infected with *E. coli O157:H7*, resulting in 27 recognized cases of HUS, and 7 deaths. *Id*. at 445. The WHS followed 2,069 eligible study participants. *Id*. For *Salmonella* specific references, *see* Smith, J.L., Bayles, D.O., *Post-Infectious Irritable Bowel Syndrome: A Long-Term Consequence of Bacterial Gastroenteritis*, Journal of Food Protection. 2007:70(7);1762-69.



MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890

despite clearance of the inciting pathogens.[32]

27. In terms of its own data, the "study confirm[ed] a strong and significant relationship between acute enteric infection and subsequent IBS symptoms."[33] The WHS also identified risk factors for subsequent IBS, including younger age; female sex; and four features of the acute enteric illness – diarrhea for more than seven days, presence of blood in stools, abdominal cramps, and weight loss of at least ten pounds.[34]

28. IBS is a chronic disorder characterized by alternating bouts of constipation and diarrhea, both of which are generally accompanied by abdominal cramping and pain.[35] In one recent study, over one-third of IBS sufferers had had IBS for more than ten years, with their symptoms remaining fairly constant over time.[36] IBS sufferers typically experienced symptoms for an average of 8.1 days per month.[37]

29. As would be expected from a chronic disorder with symptoms of such persistence, IBS sufferers required more time off work, spent more days in bed, and more often cut down on usual activities, when compared with non-IBS sufferers.[38] And even when able to work, a significant majority (67%) felt less productive at work because of their symptoms.[39] IBS symptoms also have a significantly deleterious impact on social well-being and daily social

---

[32] *Id*. at 445 (citing multiple sources).
[33] WHS, supra note 31, at 449.
[34] *Id*. at 447.
[35] A.P.S. Hungin, *et al., Irritable Bowel Syndrome in the United States: Prevalence, Symptom Patterns and Impact*, Aliment Pharmacol. Ther. 2005:21 (11); 1365-75.
[36] *Id. at 1367.*
[37] *Id.*
[38] *Id*. at 1368.
[39] *Id.*



MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890

activities, such as undertaking a long drive, going to a restaurant, or taking a vacation.[40] Finally, although a patient's psychological state may influence the way in which he or she copes with illness and responds to treatment, there is no evidence that supports the theory that psychological disturbances in fact cause IBS or its symptoms.[41]

**D. R.T.'s *E. coli* Infection and Hemolytic Uremic Syndrome.**

30. On June 19, 2026, Plaintiffs purchased two five-pound loaves of Sierra Nevada Graziers raw, grass-fed medium cheddar cheese. The cheese was delivered to Plaintiffs by Azure Standard at a community drop point in Nashville, Michigan, and Plaintiffs brought it into their home in Charlotte, Michigan.

31. Between approximately July 27, 2026, and August 3, 2026, R.T., who was then 18 months old, ate the Graziers raw milk medium cheddar cheese that Plaintiffs had purchased. Before her illness, R.T. was a healthy child with no pre-existing medical conditions.

32. On August 3, 2026, R.T. developed diarrhea. On August 6, she began vomiting, and on August 7, Plaintiffs took her to a provider, who believed she had a viral illness. Over the next two days R.T.'s condition deteriorated: she could not keep fluids down, she became extremely lethargic, and her diarrhea turned bloody.

33. On August 9, 2026, Plaintiffs took R.T. to an emergency department, where blood work showed severely abnormal kidney function markers and anemia. R.T. was transported by ambulance to a pediatric intensive care unit, where a stool sample tested positive

---

[40] *Id.*

[41] Amy Foxx-Orenstein, DO, FACG, FACP, *IBS—Review and What's New*, General Medicine 2006:8(3) (Medscape 2006) (collecting and citing studies). Indeed, PI-IBS has been found to be characterized by more diarrhea but less psychiatric illness with regard to its pathogenesis. *See* Nicholas J. Talley, MD, PhD, *Irritable Bowel Syndrome: From Epidemiology to Treatment*, from American College of Gastroenterology 68th Annual Scientific Meeting and Postgraduate Course (Medscape 2003).



MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890

for STEC and R.T. was diagnosed with HUS.

34. R.T.'s kidneys stopped functioning, and she stopped producing urine. She required dialysis by continuous renal replacement therapy, which required that she be fully sedated and placed on a ventilator for several days. She also required blood transfusions, and she developed a lung infection and a urinary tract infection. On August 15, 2026, R.T. was transferred to a second children's hospital, where she continued to receive treatment for HUS, including dialysis and physical and occupational therapy. In all, R.T. was hospitalized for approximately 19 days.

35. R.T.'s illness was reported to public health authorities, and investigators from the CDC contacted Plaintiffs regarding R.T.'s illness in connection with the outbreak investigation. Upon information and belief, R.T. is the Michigan case reported by the CDC as part of the multistate outbreak of *E. coli O26:H11* infections linked to Graziers raw milk cheese.

36. Although R.T. has been discharged from the hospital, she continues to have elevated kidney function markers, high blood pressure requiring medication, and protein in her urine. She requires ongoing medical monitoring of her kidney function, and she faces the risk of the long-term renal complications of HUS described above.

37. R.T.'s illness also caused Plaintiffs significant losses of their own. Plaintiffs stayed at the hospital with R.T. throughout her 19-day admission, made repeated trips between the hospital and their home, and arranged childcare for their other two young daughters. Plaintiff Ryan Tennant missed approximately three weeks of work, from August 10, 2026, through August 30, 2026, and lost the wages for that period. Plaintiffs have incurred, and will continue to incur, medical, travel, childcare, and other expenses for R.T.'s care.



MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890

38. As a direct and proximate result of consuming Defendant's contaminated cheese, R.T. suffered an *E. coli O26:H11* infection, HUS, and the illness and injuries described herein, including acute kidney failure, physical pain and suffering, ongoing impairment of her kidney function, and a diminished quality of life.

## IV. CAUSES OF ACTION

### STRICT PRODUCT LIABILITY

39. Plaintiffs incorporate by reference each and every foregoing paragraph of this Complaint as if fully set forth herein.

40. At all times relevant hereto, Defendant was the manufacturer, distributor, and/or seller of the adulterated food product that is the subject of this action—Graziers raw milk cheese—which R.T. consumed, leading directly and proximately to the injuries described herein.

41. The adulterated food product that Defendant manufactured, distributed, and/or sold was, at the time it left Defendant's control, defective and unreasonably dangerous for its ordinary and expected use because it was contaminated with *E. coli O26:H11*, a Shiga toxin-producing pathogen.

42. The adulterated food product that Defendant manufactured, distributed, and/or sold was delivered to R.T. without any change in its defective condition, and was used in the manner expected and intended, i.e., human consumption, and was consumed by R.T.

43. Defendant owed a duty of care to R.T. to manufacture, distribute, and/or sell food that was not adulterated, that was fit for human consumption, and that was free of pathogenic bacteria or other substances injurious to human health. Defendant breached this duty.



MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890

44. Plaintiffs and R.T. suffered injury and damages as a direct and proximate result of the defective and unreasonably dangerous condition of the adulterated food product that Defendant manufactured, distributed, and/or sold.

**BREACH OF WARRANTY**

45. Plaintiffs incorporate by reference each and every foregoing paragraph of this Complaint as if fully set forth herein.

46. Defendant manufactured, produced, distributed, and/or sold the contaminated food product that injured R.T. and caused R.T.'s *E. coli O26:H11* infection. Defendant is, therefore, a manufacturer, distributor, and/or seller of an adulterated food product, and the adulterated food product reached R.T. without substantial change from the condition in which it was sold by Defendant.

47. Defendant is subject to liability to Plaintiffs for its breaches of express and implied warranties made with respect to the food product sold, including the implied warranties of merchantability and of fitness for a particular use. Defendant expressly warranted, through the sale of food to the public, and by the statements and conduct of its employees and agents, that the food product ultimately consumed by R.T. was fit for human consumption, and not otherwise adulterated or injurious to health.

48. The food product sold by Defendant and ultimately consumed by R.T., which product was contaminated with *E. coli O26:H11* and related adulteration, would not pass without exception in the trade, and was thus in breach of the implied warranty of merchantability.

49. Plaintiffs further allege that the contaminated food sold by Defendant and consumed by R.T. was not fit for the uses and purposes intended by either Plaintiffs or



MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890

Defendant, i.e., human consumption, and that this product was therefore in breach of the implied warranty of fitness for its intended use.

50. As a direct and proximate result of Defendant's breaches of express and/or implied warranties, R.T. suffered an *E. coli O26:H11* infection and the adverse effects associated with the same, was forced to endure pain, suffering, and inconvenience, was forced to submit to medical care, and suffered an inability to perform the activities of daily living, all as described herein.

**NEGLIGENCE**

51. Plaintiffs incorporate by reference each and every foregoing paragraph of this Complaint as if fully set forth herein.

52. Defendant had a duty to comply with all statutory and regulatory provisions that pertained or applied to the manufacture, distribution, storage, labeling, and sale of the food product that injured R.T., including the applicable provisions of the Federal Food, Drug, and Cosmetic Act, and similar Michigan food and public health statutes, including without limitation the provisions of MCL 289.5101, which prohibit the manufacture and sale of any food that is adulterated or otherwise injurious to health.

53. The food product that Defendant manufactured, distributed, and/or sold, and that R.T. consumed, was adulterated within the meaning of the Federal Food, Drug, and Cosmetic Act, and similar Michigan statutes, because it contained a deleterious substance that rendered it injurious to health, i.e., *E. coli O26:H11*, a Shiga toxin-producing pathogen.

54. Defendant owed a duty to the ultimate consumers of its food products, including R.T., to use reasonable care in the manufacture, preparation, and sale of such products, and to prevent or eliminate the risk that its food products would be contaminated with *E. coli O26:H11*



MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890

or any other pathogen. Defendant breached this duty.

55. Defendant had a duty to use supplies and raw materials in producing its food products that were in compliance with applicable federal, state, and local laws, ordinances, and regulations; that were from reliable sources; and that were clean, wholesome, free from adulteration, and fit for human consumption, but failed to do so, and therefore breached that duty.

56. Defendant had a duty to properly supervise, train, and monitor its employees, and the employees of its agents or subcontractors, engaged in the manufacture, preparation, and sale of its food products, to ensure compliance with Defendant's operating standards and with all applicable health regulations, but failed to do so, and thus breached that duty.

57. Defendant had a duty, given the known risk that raw (unpasteurized) milk and the products made from it may carry STEC and other pathogens, and the heightened danger those pathogens pose to young children, to take reasonable measures to ensure that the raw milk and other ingredients used in its Graziers raw milk cheese were safely produced, processed, and handled, and were not produced, processed, or handled under conditions known, or that reasonably should be known, to the food industry to be unsafe. Defendant breached these duties.

58. R.T.'s *E. coli O26:H11* illness and injuries, and Plaintiffs' resulting damages, occurred as a direct and proximate result of Defendant's breach of duties and noncompliance with applicable law and safety regulations.

**VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT**

59. Plaintiffs incorporate by reference each and every foregoing paragraph of this Complaint as if fully set forth herein.



MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890

60. Defendant breached implied warranties that resulted in a violation of the Michigan Consumer Protection Act, MCL 445.901 et seq., entitling Plaintiffs to relief, including attorney fees, under MCL 445.903(1).

61. Defendant expressly and impliedly represented and promised that the food it manufactured, prepared, and/or sold was of high quality, was fit for human consumption, and was safe, and violated those representations and promises in violation of the Michigan Consumer Protection Act, MCL 445.903(1).

62. As a direct and proximate result of conduct by Defendant that was in violation of the Michigan Consumer Protection Act, Plaintiffs and R.T. sustained injury and damages in an amount to be determined at trial.

## V. DAMAGES

63. Plaintiffs incorporate by reference each and every foregoing paragraph of this Complaint as if fully set forth herein.

64. R.T. has suffered general, special, incidental, and consequential damages as the direct and proximate result of the acts and omissions of Defendant as stated herein, in an amount that shall be fully proven at the time of trial. These damages include, but are not limited to: damages for general pain and suffering; damages for loss of enjoyment of life, both past and future; past medical and medical-related expenses; future medical and medical-related expenses; travel and travel-related expenses, both past and future; emotional distress, past and future; pharmaceutical expenses, past and future; and all other ordinary, incidental, or consequential damages that would, or could, be reasonably anticipated to arise under the circumstances.

65. Plaintiffs Ryan Tennant and Maisie Tennant, individually, have also suffered damages as the direct and proximate result of the acts and omissions of Defendant as stated



MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890

herein, in an amount that shall be fully proven at the time of trial. These damages include, but are not limited to: past and future medical, medical-related, and pharmaceutical expenses incurred for R.T.'s care and treatment; travel and travel-related expenses; childcare expenses; lost wages and time away from work to care for R.T.; and all other ordinary, incidental, or consequential damages that would, or could, be reasonably anticipated to arise under the circumstances.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

A. For compensation for all general, special, incidental, and consequential damages suffered by Plaintiffs and R.T. as a result of Defendant's conduct;

B. For statutory prejudgment interest;

C. For reasonable attorney fees and costs, to the fullest extent allowed by law, including under the Michigan Consumer Protection Act; and

D. For all such additional and further relief as this Court deems just and equitable.

## VII. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED this 6th day of October, 2026.

By: /s/ William D. Marler
William D. Marler, WA17233
**MARLER CLARK, INC., PS**
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(206) 346-1890
bmarler@marlerclark.com

*Counsel for Plaintiffs*